FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALANDIS CRAINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-cv-6325 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| EMMETT MCCLENDON, Star #1467, | ) | |
| LUIS ESCOBEDO, Star #11877, and | ) | Plaintiff Requests Trial by Jury |
| OFFICER JOHN DOE, | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff, ALANDIS CRAINE, by and through his attorney, the Law Office of Sean Brown, for his First Amended Complaint against Defendants, CITY OF CHICAGO, EMMETT MCCLENDON, Star #1467, LUIS ESCOBEDO, Star #11877, and OFFICER JOHN DOE, alleges as follows:

**PARTIES**

1. Plaintiff ALANDIS CRAINE (hereinafter "CRAINE") is an African American male and is a resident of Chicago, Cook County, Illinois.

2. Defendant CITY OF CHICAGO is a municipal corporation incorporated under the laws of the State of Illinois.

3. Defendant EMMETT MCCLENDON, Star #1467, is a CITY OF CHICAGO police sergeant who, at all pertinent times, was acting under color of state law and as the employee, agent, and representative of the CITY OF CHICAGO Police Department. This defendant is being sued in his individual capacity.

1

4. Defendant LUIS ESCOBEDO, Star #11877, is a CITY OF CHICAGO police officer who, at all pertinent times, was acting under color of state law and as the employee, agent, and representative of the CITY OF CHICAGO Police Department. This defendant is being sued in his individual capacity.

5. Defendant OFFICER JOHN DOE is a CITY OF CHICAGO police officer who, at all pertinent times, was acting under color of state law and as the employee, agent, and representative of the CITY OF CHICAGO Police Department. This defendant is being sued in his individual capacity.

## JURISDICTION AND VENUE

6. This action arises under the United States Constitution and the Civil Rights Act of 1871 [42 U.S.C. Section 1983].

7. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. Sections 1331 and 1343(a).

8. This Court has jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9. This Court has personal jurisdiction over defendants as they are residents of Illinois, and all actions complained of herein occurred in Illinois.

10. Venue is proper in this District because all of the conduct complained of occurred in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**Craine's Arrest**

11. On or around July 10, 2014, CRAINE was seized by Sergeant Emmett McClendon, Officer Luis Escobedo, and Officer John Doe (collectively "Defendant Police Officers") at or

2

about the location of 7944 South Throop Street, in the CITY OF CHICAGO, County of Cook, State of Illinois.

12. On said date, at approximately 11:15 p.m., CRAINE was on his front porch socializing with a friend when they both heard gunshots.

13. Briefly after the gunshots, an unmarked police car was speeding the wrong way on a one-way street heading in the direction of CRAINE'S residence.

14. At this point, CRAINE began walking back into his residence when Defendant Police Officers ran towards CRAINE'S home and made forced entry into his residence by breaking the door.

15. At the time of the forced entry, the Defendant Police Officers did not have an arrest warrant for CRAINE or a search warrant for his residence.

16. Upon forcing entry into CRAINE'S residence, the Defendant Police Officers seized and searched CRAINE and recovered nothing - finding no evidence of illegal activity.

**Search of Residence**

17. Defendant Police Officers then arrested CRAINE and searched the house without a warrant.

18. Defendant Police Officers claimed to have recovered a gun and cannabis from the home, and they asked CRAINE'S elderly grandmother, one of numerous individuals who lived in the residence, to sign a consent to search form after said search had already taken place.

19. CRAINE'S grandmother signed the consent to search form out of fear based on the officers' strong show of authority.

20. CRAINE was subsequently arrested and charged with manufacture and delivery of cannabis and unlawful use of a weapon by a felon.

21. The arrest of CRAINE by Defendant Police Officers was made without probable cause or any other legal basis.

22. At some point after CRAINE'S arrest, Defendants McClendon and Escobedo created a police report in which they falsely documented that CRAINE made admissions to possessing the drugs and firearm.

23. Defendants McClendon and Escobedo did these things because they were aware that probable cause did not exist to go into CRAINE'S residence or to charge CRAINE with a crime.

24. CRAINE was incarcerated for the first two months of his pretrial proceedings.

**Suppression Hearing**

25. Prior to trial, before Judge Thomas Davy of the Circuit Court of Cook County, a hearing was held on CRAINE'S motion to quash arrest and suppress evidence.

26. At the hearing CRAINE introduced testimony from the friend who was on CRAINE's porch the night of the shooting, Darnell Moore; CRAINE introduced testimony from his grandmother, Pearlie Craine; and CRAINE elicited testimony from Defendant McClendon.

27. Although Defendant McClendon admitted to seizing CRAINE without a warrant and searching his residence without a warrant, the trial court denied CRAINE'S motion to quash arrest and suppress evidence.

**Trial and Sentencing**

28. At trial, the only evidence introduced against CRAINE was the testimony of the Defendant Escobedo. There was no physical evidence collected that connected CRAINE to a crime. Defendant Escobedo, however, falsely testified that CRAINE made admissions to possessing the cannabis and the gun. Defendant Escobedo did not have CRAINE sign a

4

    Miranda waiver, nor did he have CRAINE record this alleged statement in writing or into any audio or video medium.

29. Despite the Defendant Police Officers having no reasonable suspicion to detain CRAINE or probable cause to seize him and search his residence, the trial court convicted CRAINE of manufacture and delivery of cannabis and unlawful use of a weapon by a felon.

30. CRAINE was then sentenced to 26 months of incarceration for the offense of manufacture and delivery of cannabis and another 26 months of incarceration for the offense of unlawful use of a weapon by a felon – both convictions were to run concurrently. In addition, the trial court gave CRAINE a recommendation to the boot camp program.

31. CRAINE was ultimately placed in the boot camp program and released from custody after being incarcerated for a total of six months. During those six months, CRAINE was wrongfully deprived of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on significant time with his children, including the sharing of holidays, the birth of his first daughter, funerals, and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being.

**Craine's Exoneration**

32. CRAINE fought tirelessly to overturn his wrongful conviction, which was finally reversed and vacated by the Illinois Court of Appeals on March 26, 2020.

33. The reversal of CRAINE'S conviction for the criminal charges is indicative of and consistent with CRAINE'S innocence of the charges because the Illinois Appellate Court stated, "the facts and circumstances were insufficient to suggest that CRAINE had committed or was committing a crime." People v. Craine, 2020 IL App (1st) 163403, ¶ 32.

**The City's Policy and Practice of Impunity**

34. At all times relevant to the prosecution of Plaintiff CRAINE, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police detectives arrested an individual without probable cause.

35. Prior to and during the period in which CRAINE was arrested, charged, and prosecuted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

36. The U.S. Department of Justice issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers need help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

37. On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity,

6

for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

38. The DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the Department of Justice found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints are sustained, discipline was inconsistent and unpredictable.

39. Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority."

40. Between 2004 and 2016, the City paid more than $500 million to settle or pay judgments in police misconduct cases. Yet, the City failed to conduct disciplinary investigations in more than half of the cases and recommended discipline in fewer than 4% of those cases.

41. Between 2011 and 2015, nearly half of complaints filed against Chicago Police officers were not even investigated. More than 95% of complaints against the Chicago Police that were investigated were found to be "unsustained." And less than 2% of complaints against the Chicago Police resulted in any discipline.

42. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

43. The failure of police supervision and discipline in the City of Chicago during the relevant time period is a fact admitted by Chicago police officers and City policymakers. In December 2016, the President of the police officers' union for the City of Chicago admitted that there is a "code of silence" in the Chicago Police Department. In 2017, the U.S. Department of Justice found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence." And former Chicago Mayor Rahm Emanuel also has acknowledged that a "code of silence" exists within the Chicago Police Department.

44. The code of silence in the Chicago Police Department is longstanding and has been documented for decades. In the case of Klipfel v. Bentsen, No. 94 C 6415 (N.D. Ill.), a federal jury found that as of 1994 the Chicago Police maintained a code of silence that facilitated police misconduct. In Obrycka v. City of Chicago, No. 07 C 2372 (N.D. Ill.), a different federal jury found that, as of February 2007, "the City had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

45. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers, including the Police Officer Defendants,

8

have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

46. The same code of silence and ineffective system of police oversight were in place when CRAINE'S constitutional rights were violated July of 2014. Defendant City of Chicago's policy and practice of allowing police officers to violate the constitutional rights of members of the public with impunity was a cause of the violations of CRAINE'S constitutional rights alleged herein.

**Policy and Practice of Violating Individuals' Due Process Rights**

47. Consistent with the municipal policy and practice, employees of the City of Chicago, including the named Police Officer Defendants, fabricated reports and other evidence that was used to wrongfully prosecute CRAINE.

48. The City of Chicago and the Chicago Police Department also failed in the years prior to CRAINE'S wrongful arrest and prosecution to provide adequate training to Chicago Police officers in any of the following areas, among others:

   a. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses;

   b. The risks of wrongful conviction and the steps police officers should take to minimize risks;

   c. The risks of engaging in tunnel vision during investigation; and

9

    d.  The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

49. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused CRAINE'S wrongful conviction and injuries.

50. The City's failure to train, supervise, and discipline its officers condones, ratifies, and sanctions the kind of misconduct that Defendants committed against CRAINE. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices described above.

51. The City of Chicago and final policymaking officials within the Chicago Police Department failed to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy CRAINE'S ongoing injuries.

52. The office of Chicago Mayor Lori Lightfoot recently issued a statement acknowledging that a number of systemic changes are necessary to address the wrongs committed by Chicago Police, and the Mayor is committed to working towards necessary policy changes.

**Craine's Injuries**

53. During his eight (8) moths of wrongful imprisonment, CRAINE was deprived of the ability to interact freely with his loved ones; to be present for holidays, births, and other life events; to pursue his passions and interests; to engage in meaningful labor and develop a career; and to live freely, as an autonomous being.

54. Instead, CRAINE was detained in harsh, strict, and labor-intensive conditions in a military-style boot camp.

55. Because of his wrongful imprisonment, CRAINE was separated from his teenage son and infant daughter, he was unable to parent them and to participate in their growth and development. CRAINE was also separated from the mother of his children and was thus deprived of companionship and the unique experiences of building a loving family together.

56. As a result of his wrongful conviction and incarceration, CRAINE must now attempt to rebuild his life outside of prison, all without the benefit of the life experiences that ordinarily equip adults for such a task.

57. In addition to causing the severe trauma of CRAINE'S wrongful imprisonment and loss of liberty, the Defendants' misconduct caused and continues to cause CRAINE extreme physical and psychological pain and suffering, humiliation, fear, anxiety, deep depression, despair, and other physical and psychological effects.

## FEDERAL CLAIMS - 42 U.S.C. § 1983

**COUNT I: DUE PROCESS VIOLATION AGAINST DEFENDANT POLICE OFFICERS**
**(Deprivation of Liberty without Probable Cause)**

58. Plaintiff realleges and incorporates herein by reference paragraphs one to fifty-seven (1-57) as if set forth in full herein.

59. As described more fully above, the Defendant Police Officers, while acting individually, jointly, and in conspiracy with other named and unnamed individuals, as well as under color of law and within the scope of their employment, deprived CRAINE of his constitutional right to a fair trial, which includes the right to not be wrongfully convicted, and the right to be free of involuntary confinement.

11

60. As described more fully above, the Defendant Police Officers deliberately forced entry into CRAINE'S home without a warrant, fabricated reports, and falsely testified that CRAINE confessed to possessing a firearm and cannabis.

61. The misconduct described in this Count was objectively unreasonable, and was undertaken and effected intentionally, and in total disregard of CRAINE'S constitutional rights.

62. Absent this misconduct, the prosecution of CRAINE could not and would not have been pursued.

63. The Defendant Police Officers' misconduct also directly resulted in the unjust criminal conviction of CRAINE, thereby denying him his constitutional right to a fair trial in violation of the Due Process Clause of the Fourth and Fourteenth Amendments to the United States Constitution.

64. As a result of this violation of his constitutional right to a fair trial, CRAINE suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

65. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to CRAINE'S constitutional rights. Therefore, Defendants are liable for this misconduct under 42 U.S.C ¶ 1983.

### COUNT II: MONELL CLAIM AGAINST CITY OF CHICAGO

66. Plaintiff realleges and incorporates herein by reference paragraphs one to sixty-five (1-65) as if set forth in full herein.

67. The City of Chicago's policies and practices ensure that officers who commit constitutional violations against citizens go unpunished.

68. Police officers for the City of Chicago can accumulate shockingly high numbers of complaints against citizens, yet they are almost never counseled, instructed, guided, or trained to stop (let alone disciplined for their actions).

69. Because of these policies and practices, Chicago police officers can and do commit constitutional violations with impunity, protected by the knowledge that they will suffer no consequences for their actions.

70. This policy and practice of not preventing or stopping police misconduct caused CRAINE to suffer the constitutional deprivations that he did. The officers who violated his rights did so with the knowledge that they could do as they pleased and would never have to face punishment for their actions.

71. Therefore, the City of Chicago is liable to Plaintiff under 42 U.S.C ¶ 1983.

## STATE LAW CLAIMS

### COUNT III: MALICIOUS PROSECUTION
### AGAINST DEFENDANT POLICE OFFICERS

72. Plaintiff realleges and incorporates herein by reference paragraphs one to seventy-one (1-71) as if set forth in full herein.

73. By the actions detailed above, the Defendant Police Officers knowingly sought to and did in fact maliciously prosecute CRAINE on charges for which they knew there was no probable cause from July of 2014 to December of 2016.

74. In the manner described above, the Police Officer Defendants, individually, jointly, and/or in conspiracy with one another, and others unknown, as well as within the scope of their employment, unreasonably accused CRAINE of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against CRAINE without any probable cause for doing so.

75. The Defendant Police Officers further provided misinformation and false testimony, which was instrumental both to the initiation of CRAINE'S prosecution and his ultimate conviction.

13

76. The Defendant Police Officers caused CRAINE to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

77. The judicial proceedings against CRAINE were terminated in his favor when the Illinois Court of Appeals reversed his conviction outright after finding the Defendant Police Officers had no reasonable suspicion that CRAINE was committing or was about to commit a crime.

78. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth of CRAINE'S innocence.

79. As a result of the Defendants' misconduct described in this Count, CRAINE suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, exposure to public scandal and disgrace, damage to his reputation, attorneys' fees, embarrassment, and other grievous and continuing injuries and damages as set forth above.

**COUNT IV – RESPONDEAT SUPERIOR AGAINST THE CITY OF CHICAGO**

80. Plaintiff realleges and incorporates herein by reference paragraphs one to seventy-nine (1-79) as if set forth in full herein.

81. While committing the misconduct alleged in the preceding paragraphs, the Police Officer Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

82. Defendant City of Chicago is liable as principal for all torts committed by its agents.

**COUNT V – INDEMNIFICATION AGAINST THE CITY OF CHICAGO**

83. Plaintiff realleges and incorporates herein by reference paragraphs one to eighty-two (1-82) as if set forth in full herein.

14

84. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

85. The Defendant Police Officers were employees and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

86. Defendant City of Chicago is responsible to pay any judgment entered against the Police Officer Defendants. Plaintiff therefore demands judgment against Defendant City of Chicago, in the amounts awarded to Plaintiff against the Police Officer Defendants as compensatory damages, attorneys' fees, costs and interest.

**WHEREFORE**, Plaintiff CRAINE respectfully requests:

A. That he be awarded compensatory damages, punitive damages, and any such other amount to be determined at trial to compensate him for mental anguish, humiliation, degradation, physical and emotional pain and suffering, inconvenience, lost wages and benefits, and other consequential damages;

B. That Defendants be required to pay prejudgment interest to Plaintiff on these damages;

C. That Plaintiff be awarded reasonable attorneys' fees, costs, and litigation expenses; and

D. For such other relief as the Court may deem just or equitable.

RESPECTFULLY SUBMITTED,

/s/ *Sean Brown*
Sean Brown
Plaintiff's Attorney
The Law Office of Sean Brown
111 W. Jackson Blvd, Suite 1700
Chicago, IL 60604
Tel: 312-675-6116
Fax: 312-675-6001
attorneyseanbrown@gmail.com

15

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that a copy of the foregoing Plaintiff's First Amended Complaint was served upon all counsel of record on February 25, 2021, through the Court's electronic filing and docketing system.

/s/ *Sean Brown*
Sean Brown
Attorney for Plaintiff


Sean Brown
ARDC# 6308654
The Law Office of Sean Brown
111 W. Jackson Blvd, Suite 1700
Chicago, IL 60604
Tel: 312-675-6116
Fax: 312-675-6001
attorneyseanbrown@gmail.com